Mr. Onrath, you may proceed. Thank you very much, Your Honor. This is not the usual type of case for my firm, nor for Karen, Kendall, and I. Most of the cases we deal with deal with money, quite frankly, and others. There's going to be some serious injuries, often times in the back, financial or physical, but this case is really outside of our normal range of cases. Now, when you're dealing with money damages, we found that people and lawyers will do a lot of things, say a lot of things, so quite frankly, we felt that we had seen it all. Between our combined experience over 50 years of reading trial transcripts, we kind of thought that we'd seen everything that we needed to see, the worst of the worst, the best of the best. I think I can speak for Karen when I say that when we read the transcript of the hearing in this case, we were, quite frankly, horrified. This is a profoundly disturbing case, and I encourage the Court to review the transcript carefully, to see just how this case was prosecuted. Now, what happened in this case? We have a finding of parental unfitness, and let's look at what actually occurred in this case. We have a husband and wife. They have two twins. They're sitting on a Friday evening, relaxing. The mother takes one twin up a short flight of stairs. It's a split-level home. She's right in close proximity to her husband, while the husband remains on the sofa with the other child. She hears no signs of distress, no screaming on the part of the child, no crying, nothing. No sounds of anger, no sounds of distress of any kind. She calls out to her husband and says, bring me a diaper. He leaves the other twin on a boppy pillow, a U-shaped pillow, on the sofa, goes up the stairs, brings her a diaper, and they hear a muffled thud and a muffled cry. Now, the trial judge concluded, he said, maybe, maybe Michael Weiss had a momentary flash of anger. And we have to ask, when did this happen? Did this happen silently? There were no signs. There's no reason for it. There's no baby crying. There's the reason you would expect somebody to shake a child is because the child is somehow annoying you, is somehow creating some type of disturbance. None of that happened here. So we argued at the opening of her brief, where is the predicate act? And the response is, well, we don't have to show a predicate act. We just need to show that it happened. Well, quite frankly, Your Honor, the two questions are inextricably tied together. You have to have a reason for why this baby was supposedly shaken. You have to have something that caused it, and there was nothing. One of the key signs of shaken baby syndrome is a parent who is prone to anger. Now, look at Michael Weiss. He teaches special education to small children, to mentally disabled children. Now, you would think that a tenured education professor for developmentally disabled children, if he'd had a problem with anger, perhaps, most likely, that anger would have manifested itself at some prior time, and it never did. I have scores of witnesses who were willing to testify that this man had a perfect demeanor with children. They had two foster children for many years. Any reports of anger problems? Absolutely none. Any reports of abuse? Absolutely none. There's another sign of shaken baby syndrome. Peer-reviewed medical journals find that in almost every case, we're talking over 72% of the cases, there are corroborating injuries. You have retinal hemorrhaging, you have long bone fractures, you have bruising, visceral injuries, injuries to the organs. We have none of that here. What we have is a pediatrician, board certified for less than five years, who spoke to police officers and said, I think this baby was shaken, and I think that the father did it. Now, why did she say that? Because she'd heard that the father was the last one with the child before the fall. Because she had no other choice. Who else was there? Is she going to blame the wife? Well, the police jumped on this. The police, well, they called an investigation, but I think it would be better to say that they were there to interrogate, referring to him repeatedly as a piece of shit. This man has been put through the wringer. He's standing there in the hospital. At one point, he turns to his wife and he says, I'd like to speak with you alone a minute and talk about this. This is from the DCF investigator. Now, what was said there? Well, we don't know because they never inquired. The state was much happier to have this innuendo out there, this possibility that some secrets transpired between them. And yet, the record's clear that Lori Weiss has never once wavered in support of her husband. Why would that happen? In contrast, well, let me just make one other remark about the state's expert, Dr. Pratchard. She was asked to explain this discrepancy between peer-reviewed medical studies that show there are almost always going to be corroborative injuries and the fact that this child had none. And she fell apart, quite frankly. She had nothing to say. What her response, which is laid out in our brief, is best described as gibberish. She really didn't know. What she did know was her unfounded conviction that this father had done this. And on what evidence? Nobody saw it. There's no reason for it. Nobody heard any, could explain why it occurred. Now, Michael Weiss came forward, his attorneys came forward with a neurosurgeon who had treated between 200 and 300 pediatric brain injuries. And he said, yes, yeah. He said this could have been caused by shaken baby syndrome. But he says, but there are a lot of other causes. This child had a chronic subdural hematoma, meaning that there was blood on the brain, a bruise on the brain. He said that chronic condition had no relationship at all to the allegation of shaken baby. He said that when you have a chronic subdural hematoma, that a minor fall, such as this child had in this case, could easily cause the acute small amount of bleeding that they found on the MRI. In other words, it could be shaken baby syndrome or it could not. There's only one difference, though. With shaken baby syndrome, you almost always have some kind of corroborative evidence. You have perhaps a witness. You have perhaps a history of prior anger management problems. You have perhaps bruising, retinal hemorrhaging, damage to the organs, cracked ribs, long bone fractures. None of these are there. Dr. Oliveira was not out there to blindly rule one way or the other. What he's saying is that there's no way that anybody can tell, particularly in a case like this. So what we're left with is this. We've had a family destroyed on a maybe, just a possibility. Maybe it happened. Maybe it didn't. What does your doctor have to say? Did your doctor address the temporal issue? Because there apparently is no dispute that at the babysitter's house there was a fall as well. Well, and my understanding of the testimony is that shaken baby syndrome usually occurs, the symptoms arise soon after the accident. Now, according to the babysitter, there were no symptoms. Now, again, this babysitter was not placed anywhere near the interrogation level that my police was. But she claims that the child had no symptoms at all. Now, when the child came home from the babysitter, all they noticed is that the baby seemed to be sleeping unnaturally longer. That's all they know. Whether the fall at the babysitter's contributed or not, again, it's a maybe. No one can say.  Yes? The child was afflicted with this. Yes. And so you ask, well, what causes that? And they say it can have many causes. Dr. Olivero testified that it is usually related to birth trauma. But there is no question from any expert that this subdural hematoma is not claimed to have played any role in any allegations of child abuse. I'd like to look at focus on the trial court's order. He said that the court found that the physical and medical evidence proves, this is a quote, it says it proves that the type of injury the child suffered was the result of non-accidental trauma. Well, that's not true. What the evidence proved is that it might or might not be the result of non-accidental trauma. Trial court also said that the evidence proves that the injuries occurred while in the presence and care of Michael Wiese. Well, actually, no, Your Honor. The evidence proves that the injuries, the fall from the couch, occurred when Michael Wiese wasn't there. He was with his wife standing up a half staircase away. There's no allegations of anybody seeing him shake this baby, nor is there any evidence at all that he actually did. The only injury we have any proof of is that this child rolled off the sofa. While Michael Wiese was with his wife, just a few steps away up the staircase. The evidence established that no one could say what caused this injury. We do know this. There were absolutely no corroborating evidence of abuse. Now, the trial court also said... I'm sorry. The trial court said that this could have only happened while Michael Wiese was with the child. Again, that's quite simply against the manifest way to the evidence. Lori Wiese was right there. Why is it that Lori Wiese... Why is it that she is not also being held culpable in this case? How is her culpability any less than Michael Wiese's? They were both there, both caring for their children. The trial court ruled that there is no evidence that Lori Wiese was informed of her husband's actions which caused injury to the child. What actions? What did he do? Who saw it? Again, the court is drawing, is clutching its straws. I'd also like to take a moment to talk about the standard of review. I started off this argument by mentioning that this is a case that's outside of our normal type of case work. In our initial brief, we had said that they were required to prove by clear and convincing evidence that Michael Wiese had abused his child. And we were mistaken in that. As it turns out, we later found that this standard is only applied when they are ready to give the child up for adoption to some other family. And they mentioned repeatedly in their brief that actually the standard is preponderance of the evidence. And I guess, again, Karen and I found ourselves somewhat stunned. The notion that the 51% rule is all it takes to destroy a family. You're not requesting us to change that rule, are you? I do not. I do not. I'd like to express my shock that this rule even exists. The evidence that exists in the record from Dr. Petrak, do you believe that it sustains the state's written rule? Absolutely not. How did it fail? It failed because she never accounted for the fact that there are no corroborating circumstances. And when she was presented or faced with evidence from peer-reviewed medical journals, pediatrics, that there are almost always corroborating injuries, she had no response. Dr. Alvaro testified for a father that this injury could be related to birth trauma. Did he review the birth records? Were these children delivered by cesarean section? They were premature births, and that's all I know. Did he testify after reviewing the medical records there was a birth trauma sufficient to produce this kind of acute hematoma? No, he didn't. Not that I'm aware of. He may have. But my recollection is that he was speaking in general terms. He said chronic subdural hematoma has many causes. But it is usually related to birth trauma. Whether that was the case in this particular child, we don't know. Certainly, I think it should also be taken into account that the twin was also examined exhaustively. No signs of abuse here. Michael Weiss, he's been fired from his job. His family's been taken away. At one point, it was recommended that he get a divorce from his wife so that his wife could rejoin the children. He said his family taken away. They tried for many years to have children of their own. That's all gone now. We're here to try to take the first steps toward putting this back together. Quite frankly, the notion that this family could be destroyed in such manner on this weak evidence, that this family could be destroyed on a maybe, is to me horrifying. Thank you very much. Thank you, Mr. Unrapp. Ms. Madison, I believe you reserved eight minutes for response. May it please the Court, Justices, Counsel. My name is Angela Madison, and I represented Addie and Jack. And juvenile law is confusing to those people who have not practiced in it. But let's focus on the issue of unfitness. Counsel is right in that the burden of proof in this case was by a preponderance of the evidence. For this finding of unfitness under Section 2-27 of the Juvenile Court Act. Counsel was wrong in that this was a parental rights termination case. It was not. Mr. Weiss's parental rights have not been terminated. Had the definition of unfitness been before the Court, then the standard would have been by clear, or the burden of proof would have been by clear and convincing evidence. It is confusing in that way. In any event, the Court did find, based on the medical evidence, that there was sufficient evidence to find that the injuries to Addie on November 21st were by non-accidental means. And it's the injuries, the compilation of injuries that existed and the ones that did not exist, that provide us with that medical evidence, as well as the onset of symptoms. Addie's injuries included an acute abdural hemorrhaging over the right frontal and parietal lobes. A frontal hemorrhage within the brain, also called a contusion, within the frontal lobe. And that is probably the most important piece of information for this Court's review, the contusion itself. As well as subarachnoid hemorrhaging across the right frontal and toward the back of her head. Let's review what the contusion is. It is actual bleeding within the brain. Can you speak up a little bit? That's not really a microphone, that's for recording. The contusion itself is an actual bruise within the brain. Tissues have broken down. The only way that happens, and that is both testified to by Dr. Petrak as well as admitted to by Dr. Oliveira, is an impact, the brain slamming against the skull and causing the tissue within the brain to break down and bleed. Dr. Oliveira admits that that cannot have occurred without there being an event. It's not disputed that there was an event. Correct. It's what was the event. That's correct. And we have to look at the significance of the injuries. This was a significant brain trauma. This wasn't one small injury. This brain suffered immediate, severe reactions to a significant injury. Dr. Petrak testified that in order for this brain to have sustained what it did and caused the symptoms that it underwent, the lack of oxygen for at least 12 seconds, the severe and frequent vomiting, the limp condition of the child, and when I mean limp, I mean this child was limp, could not hold her muscles, had no tone in her body. All these symptoms, though, what did Dr. Petrak say, okay, could that have occurred from a fall? Dr. Petrak testified that those symptoms occurred as a result of the significant injuries and the amount of injuries that happened to this child and the severity of the injuries could only have occurred from a fall high enough, she estimates, 15 feet for the brain to accelerate and upon impact deaccelerate to slam against the brain or an automobile injury or a shaking and or a throw against a soft area. If you remember, there were no injuries to the outside of her head or any part of her body. So there could not have been a fall great enough without there being some kind of evidence to the outside of her skull that such a fall occurred. Dr. Olivero testified that that contusion could not have occurred by any idiopathic means, which, by the way, were ruled out. The doctors conducted significant testing on Addie to rule out any bleeding disorders. Her primary physician even went further and did not only the normal bleeding disorder testing but even more rare bleeding disorder testing. All those were ruled out. Spinal tumors were ruled out, which could be another idiopathic cause for internal bleeding, and vascular lesions were also ruled out. Every possible test that could have ruled out any other problem other than a non-accidental shaking was conducted on Addie. So there's no medical evidence that the chronic condition could have led to this bleeding? That's correct. There is no evidence whatsoever that this child suffered anything but the non-accidental shaking. Well, we know the etiology is compression of the brain against the skull, correct? Correct. So now we're trying to figure out why is there that compression? That's correct. What you're saying is Dr. Petra's testimony, right? And you're not, because Dr. Alvaro said there could have been several reasons. Dr. Alvaro. Other non-accidental reasons. Dr. Alvaro testified. Or other accidental reasons. Well, Dr. Alvaro testified that the most common cause for these type of injuries, without even taking a look at the symptoms, was non-accidental. The next most common could have been idiopathic causes or hematoma ad infancy. What you just said, I believe, and maybe I'm mistaken, is that the testimony revealed that there were no other causes, no other possible causes of this injury to happen. That's not what I understand from reading the records. Dr. Petra. From reading Dr. Petra's testimony, if that was solely what was in the records, that would be my understanding. If you read Dr. Alvaro's, it's clear that he mentions that there are other ways that this could happen. He was speaking generally. Correct. There are other possible ways, idiopathic means, and I just named them. The vascular lesions, the spinal tumors. I'm sorry. I thought you said there was nothing in evidence to say that there was non-accidental, other than non-accidental. Well, those other ones were ruled out by the testing that was conducted on Addie. Well, idiopathic was ruled out by the testing, but we're still left with the dispute as to what caused the compression. If it's not idiopathic, it has to be through either fall or shaken baby, which is really centrifugal force issues. Correct. Okay. So the record does have a dispute. I think what Justice Litton is trying to say is that Dr. Alvaro says that there are other ways in which this compression could occur, in addition to or in contrast to shaken baby. When the question was posed to Dr. Alvaro, and I believe the question was, Dr. Alvaro, isn't it true that the contusion could not have occurred by any kind of chronic re-bleed, any kind of idiopathic cause, or hematoma by infancy? And he said that is correct, although it could have occurred by a minor fall. Which is accidental. Which would be an accidental. Except he didn't describe what a minor fall was or what else would have been present had there been a minor fall. Dr. Pedrack. I guess I'm just having trouble with what you said earlier. Thank you. Thank you, Ms. Madison. Ms. Kelly, you have reserved seven minutes to respond. That's correct. Thank you. May it please the court and counsel. The focus on this hearing, the focus on the proceedings below, was the child. It's always the best interest of the child. What happened here was Abby was presented at the hospital with this serious injury, and the doctor who took care of her during her course of treatment determined that by looking at the numerous CAT scans and MRIs that were done, by consulting with all the other doctors involved in the case, by doing complete examination following her history, determined that the injury that occurred had to have been caused by a non-accidental head trauma. She was aware of the history, of Abby's history that day, that she'd fallen off a couch onto a carpet surface at the babysitter's house and exhibited no signs of distress as a result of that. And she was aware of the history presented when Abby was brought to the hospital, which is that there had been a sudden onset of these severe symptoms. She took that history and looked at the medical evidence and determined that what she was looking at, which was some chronic subdural bleeding, more acute subdural and subarachnoid bleeding, and this contusion within the brain, this actual bleeding within the brain, and in her expert opinion, those injuries would have caused an immediate onset of symptoms, and that's what they had, an immediate onset of symptoms. Therefore, it was her expert conclusion that the trauma that caused the injuries had to have occurred immediately prior to the onset of the symptoms. In the 5 to 10 minutes immediately prior to the onset of the symptoms, the respondent father was the only person with the child. That's why the investigation ended up focusing up on him. The mother was giving a bath to the other twin up in the kitchen and did not see what happened during this 5 to 10 minute period. The doctor testified after she was actually shown pictures of their home, the couch, the location of the couch, the location of the boppy pillow on the couch, the carpeting, even the coffee table there, and the location in which Addie's body or they saw Addie lying on the carpet, that the type of injuries she had observed could not have occurred from a fall  She spoke of times when babies, unfortunately, had fallen out of beds in the hospital, a higher fall, fallen out of a crib, to a harder surface, concrete covered with linoleum, and it does not cause the kind of injuries that had occurred here. Wasn't there also a focal injury that the doctors discussed? Yes. There were subdermal hematomas, but there was a focal injury at another location without a corresponding exterior bruise. That's correct, and that's the key injury about which Ms. Madison was speaking and which initially, in his testimony, Dr. Alivero did not account for. He was more concerned with the chronic bleeding and then what he thought the impact of an acute incident such as falling off a couch could be on a chronic re-bleed, with which Dr. Petrack disagreed that it would not cause this kind of injury. But to her, a key injury was this focal point. In layman's terms, there's no exterior bruising. That's correct. The focal injury was an injury to the brain, bleeding within the brain itself, no corresponding skull fracture, bruise, anything on the outside of her scalp, and that, in her opinion, was the strongest. And then when Dr. Alivero was asked about that cross-examination is when he, I don't recall if he had accounted for it in his direct very much, but I believe even he agreed that that could not have been caused by a re-bleed from a chronic subdural bleeding, that that was a separate injury, and he could not really account for that. That was, I think, a very important injury that Dr. Petrack stressed. And what did she say was the causation of that injury? She said that was caused by shaking. She explained the baby's neck muscles are weak and that when a child is shaken and the baby can't control their head and their head is a very large percentage of their body weight, that there's not only back-and-forth motion but also a rotating motion and the brain rotates, and she thought the brain actually slammed up against the skull on the inside, and that's what would have caused the injury. That was actually an impact of the brain. The subdural comes from the bridging veins, from veins that are sheared off, but I thought she said that the focal injury was caused when the brain actually impacted against the skull as a result of a violent shaking motion. And that's what caused her to reach her opinion that the injuries to Abby were caused by an abusive head trauma. I'd also like to point out that the study with which Counsel Cross examined Dr. Petrack discussed that in 72% of the cases in which shaken baby has been diagnosed, there were also the other symptoms such as retinal hemorrhages, and she acknowledged that. She acknowledged the study. That means, of course, in 28% of the cases that doesn't exist, and she acknowledged what other symptoms could be and that they weren't present in this case. But to her, the injuries that she saw indicated that the cause of this injury, combined with the sudden onset of symptoms, had to be abusive head trauma occurring within seconds or minutes of the presentation of symptoms. Can we stop? So our standard of review here is? Manifest rate of the evidence. The judge had to determine whether it was more likely than not that the result was, that the thing was caused by. He didn't have to determine why. He didn't have to determine what the precipitating event was. He was looking at the child, the injuries that the child presented with, and determined whether they were caused by abusive head trauma. If it was non-accidental head trauma, it had to have been intentional. And he said it was a very difficult case, but he had considered all the evidence, and that was the conclusion that he reached. Well, what have we called upon to review here, though? We're reviewing the dispositional finding of unfitness. That's correct. And that was the finding that, I believe the way the judge stated it was, since he had found that the child was abused and that that was an abusive head trauma, non-accidental, that it had to be intentional. And that because the father was the sole caretaker of the child during the time period when this would have had to occur immediately prior to the onset of symptoms, that if it was intentional, that he was dispositionally unfit at this time to have care and custody of his child. In reading Athelan's brief, I had some trouble discerning how they had formulated the issue and, in fact, what they were appealing. And I believe, as I read your brief as well, you interpreted it to be an appeal only of the dispositional finding of unfit. Well, I felt that I had trouble discerning it from their brief as well, but I felt that it was all related. They were certainly, the father was contesting the finding that it was non-accidental head trauma because the impact that had on him was if it was non-accidental and he was the only caretaker. That finding only relates to a finding, ultimate conclusion of dispositional unfitness because once you determine that this is a non-accidental injury caused by a parent, as part of that disposition, you cannot return the child to the parent. So I guess as I read the issue, that's how I felt it dovetailed or overlapped. Well, actually, there was a long passage of time in this case between, almost a year, between the time of the injury and then the time that the dispositional hearing took place. And if you read the statute, you can't return the child to the parent unless and until. In fact, some services had been undertaken by the father. There's no question that he's undertaking all the services recommended and doing what is recommended that he does. So I suppose there was the possibility at that time that he could have showed that he would have done whatever he would have needed to do to be restored to fitness in that interim period of time. The judge found that not to be the case. I believe that argument was made as to what he had done up to that point. The court commended father for taking some actions. Yes. And there's nothing that would preclude the family from being reunited once father complies with the dispositional order. That's correct. I assume that that is the. . . I asked Ms. Anderson because she was the GAL. And she tells me that they are working toward reunification of the family. And father continues to have supervised visits? I believe so. I believe so. And, of course, he can file a petition to be restored to fitness. And I would assume that that's being done or in the works. Thank you. Do we have no further questions? Thank you. Mr. Unrath, you may reply. Thank you, Your Honor. I just have a few quick comments. First of all, it's true. This is not a parental termination action. And to the extent I suggest that it was, I apologize. I would also question, though, just how much different, what distinction we're drawing. These children were taken away from the parents. Over time, Laurie Weiss was allowed to move back in. Michael Weiss is not allowed to live with his family. He lost his job. He is allowed to see his children. As long as he's supervised by a DCFS caseworker. The reports from those caseworkers uniformly state that both parents are doting parents, that they are wonderful people. And it just shocks me to think what's happened to them here. Now, earlier counsel has said, well, these injuries to the child cannot occur without an event. Well, I agree. There were two events. This child took two falls in one day. I think it's important, though, that we point out that Dr. Pretrak herself conceded that when you have a chronic subdural hematoma, that a minor fall can cause the injuries that they found in this child. Now, they're talking about a 15-foot fall for a child. Quite frankly, my mind refuses to wrap around that notion. I just, again, I don't like to think about that kind of thing. But in this particular case, the evidence showed, and Dr. Pretrak conceded, that the minor acute bleeding that occurred was consistent with a minor fall in a child that has a chronic subdural hematoma. And I would direct the court's attention to the reported proceedings, volume 12, page 69 and 70. Dr. Olivero arrived at exactly that conclusion, and he said that there is only one way that you can unquivocally diagnose shaken baby syndrome, and that's if you have corroborating circumstances. In his case, he said it's almost always going to be retinal hemorrhaging. Without retinal hemorrhaging, as he put it, the diagnosis becomes uncertain. You don't know what you're dealing with. We seem to be talking about a minor fall. Dr. Pretrak said this could occur from a minor fall. Do we have any more specifics as to what is a minor fall? No, we don't, Your Honor. And I think that most parents would look at any kind of fall from a child this young as not being minor. But what we have are two falls from sofas that have been repeatedly referred to as minor falls. I think that we're dealing with this issue of the standard of review. It is manifest weight. We acknowledge that this is a very high standard. We certainly disagree with the low standard that was applied in the trial court to tear this family apart. Nevertheless, when you review the evidence in this case, there is only one conclusion that makes any sense. That no one knows what caused this. That there is no evidence that conclusively proves that Michael Reese injured his own child. But we don't have that as a standard. The trial court doesn't have that conclusive proof, does it? It has to show that it's more likely than not. And I would think that the trial court would take its role seriously there. The evidence was not evenly balanced in this case. It was because there were no corroborative circumstances. Because there is no history of anger management problems. Because there are no other injuries to this child. There were no injuries or complaints about the foster children. There were no complaints from a tenured teacher of developmentally disabled children. Frankly, you look at this case as a whole, it doesn't make sense. The trial court instead relied almost entirely on the demeanor of the witness. Are there no further questions? Thank you very much. Thank you, counsel, for your arguments in this matter this morning. It will be taken under advisement and a written disposition shall issue.